RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 24-2125

CORTEZ BLAKE,

*Defendant-Appellant.*

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cr-20519-1—Laurie J. Michelson, District Judge.

Argued: December 10, 2025

Decided and Filed: February 5, 2026

Before: SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** William C. Livingston, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellant. Sarah Alsaden, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** William C. Livingston, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellant. Sarah Alsaden, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────

## OPINION

─────────────

BLOOMEKATZ, Circuit Judge. Cortez Blake was convicted by a jury of aiding and abetting kidnapping. On appeal, Blake challenges his conviction and sentence on five grounds, spanning pre-trial motions, evidentiary objections, sufficiency of the evidence, and conditions of

supervised release.  We affirm the district court on four of the five grounds, but we remand this matter for the district court to resolve the discrepancy between the oral pronouncement of sentence and the written judgment.

**BACKGROUND**

I.      **Factual Background**

Because Blake's appeal follows a jury trial, we recite the facts in the light most favorable to the jury's verdict. *See United States v. Maya*, 966 F.3d 493, 496 (6th Cir. 2020).

On November 14, 2021, Taliyah Jackson picked up Blake in a rented SUV, and the two spent several hours driving around Detroit.  Around 5 P.M., they stopped at an intersection to decide on their plans.  While they were stopped, a car pulled up in front of them and blocked them from moving.  Jackson's friend, Amiaya Bryant, and four armed men from a rival gang exited the car and forced Jackson and Blake out of the SUV.

Blake and Jackson ran in opposite directions, and Jackson testified that she saw the men shooting at Blake as he fled.  After the shooting, Jackson found Blake holding on to a light pole at a gas station with a gunshot wound to his upper leg that prevented him from walking.  Blake called two fellow gang members, and they soon arrived to drive Blake and Jackson to the emergency room.  When the hospital admitted Blake for treatment, he left his cellphone with his friends.

Once Blake was admitted, Jackson left the hospital with Blake's friends who told her they would give her a ride home.  Instead of taking Jackson home, they drove her to a vacant lot where they questioned her about the carjacking, suspecting that she had helped orchestrate it given her friendship with Bryant.  They took her phone to search her Instagram account and her messages with Bryant and pointed a gun at her head.  Jackson testified that, while at the lot, she did not feel free to leave and was scared for her life.

Upon leaving the lot, the men drove Jackson to Blake's house and forced her inside, where they continued the interrogation.  They called two women, Maijah Greene and Shatonnia Kimbrough, who arrived at the house and repeatedly attacked Jackson.  Greene's minor sister,

known as "Fat Fat," accompanied her sister and secretly filmed two videos of the beatings. While Jackson was held at Blake's house, she messaged her mother that she had been "jumped" and was being "[h]eld hostage." Gov't Exh. 36, R. 442, PageID 5183. She also repeatedly told her mother that she thought she was going to die.

While Jackson was at Blake's house, Blake was discharged from the hospital and returned to his home wearing a hospital gown and using crutches. Blake first took Jackson into the bathroom for a private conversation, and she testified that she did not feel like she could leave. He then took her into his bedroom and told Greene and Kimbrough to attack her again. The women beat Jackson, and Blake hit her with his crutch.

After the beating, Blake ordered Jackson to go in a car with Greene and Kimbrough to show them where Bryant lived. Jackson directed the women to Bryant's house. Greene and Kimbrough took pictures of the home, and then drove Jackson to a nearby location, returned her phone, and let her exit the car. Greene told Jackson that Blake had directed her to keep the phone and assault her again, but she chose to let her leave instead. At around 1 A.M. on November 15, Jackson texted her mother to pick her up and asked her to hurry before they came back.

## II.    The Search Warrants

Law enforcement obtained several search warrants while investigating this case, both state and federal. Only the federal warrants are at issue on appeal, and none of the information recovered from the state warrants was used to establish probable cause for the federal warrants, so we do not discuss them.

The first federal warrant was issued on April 7, 2022, for copies of Instagram accounts for Blake and five of his suspected fellow gang members, including co-defendants and non-defendants in this case. From the April 7 search warrant, law enforcement discovered a November 14–15, 2021, Instagram group chat discussing the carjacking and Jackson's kidnapping. Law enforcement discovered the chat during a search of non-defendant Ramone Turner's account because Blake and his co-defendants deleted the chat from their own accounts.

The group chat commenced shortly after Blake arrived at the hospital. It began with Blake's codefendant Karamoh Turner sharing the Instagram profile of one of the men who carjacked Blake. The participants discussed retaliating against Bryant and the carjackers. One of the participants shared Bryant's profile, saying that Jackson (referred to as "girly") had identified Bryant as involved in the carjacking. Later that night, members used the group chat to coordinate transportation from Blake's house to the house of Nasir Lewis, one of Blake's co-defendants.

The next day, someone sent the video Fat Fat recorded of Jackson's beating in the group chat. The participants discussed how Lewis was visible in the video poking Jackson with his gun. Blake messaged that he had called Greene and told her to make Fat Fat delete the video. Lewis complained about the recording and said, "That is kipnapping [sic]." An hour after the conversation about the video, the chat ended with Turner telling everyone to "[l]eave this chat."

Based on the group chat, law enforcement obtained a second federal warrant to search seventeen Instagram accounts, including Blake's and Turner's, for an eight-day period for evidence of the kidnapping.

## III.    Procedural History

Alongside several co-defendants, the government charged Blake with one count of conspiracy to commit kidnapping and one count of aiding and abetting kidnapping. *See* 18 U.S.C. §§ 1201(a)(1), 2.

As we discuss in greater detail in our analysis, there are several pre-trial motions at issue on appeal, including Blake's motions to suppress and motion to exclude alleged co-conspirator statements, and the government's motion to limit cross-examination of Jackson. The district court denied Blake's motions to suppress and exclude and granted the government's motion to limit cross-examination of Jackson in part. During the trial, Blake moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, and the district court denied the motion.

At the close of the weeklong trial, the jury acquitted Blake of conspiracy to commit kidnapping and convicted him of aiding and abetting kidnapping. The district court sentenced

Blake to 198 months in prison, below his Guidelines range of 292 to 365 months. The court also imposed a five-year term of supervised release. In doing so, the court dictated several special conditions of release at the sentencing hearing; but in its subsequent written judgment, it imposed two additional conditions that had been recommended in the presentence report but had not been announced at sentencing.

Blake timely filed this appeal.

## ANALYSIS

On appeal, Blake challenges his conviction and sentence on five grounds. *First*, he argues that the district court erroneously denied his motions to suppress evidence seized from search warrants for social media account data. *Second*, he argues that the district court erred by admitting statements of his alleged co-conspirators. *Third*, he argues that the district court erred by limiting his cross-examination of the alleged victim. *Fourth*, he contends that the evidence was insufficient to support a verdict for aiding and abetting kidnapping. *Fifth*, he challenges the district court's imposition of three special conditions of supervised release. We analyze each issue in turn.

## I.     Suppression of Social Media Evidence

Before trial, the district court denied Blake's motions to suppress evidence obtained from the state and federal warrants, reasoning that admitting the evidence did not violate Blake's Fourth Amendment rights. On appeal, Blake argues that the district court should have excluded two key pieces of evidence obtained from the federal warrants: (1) the videos that Fat Fat recorded and (2) the November 14–15 group chat. We disagree.

As to the videos, the government obtained them from Fat Fat's own cellphone, not through either of the federal warrants executed against Blake. Perhaps for that reason, Blake did not move to suppress the videos below and did not object to their admission at trial, meaning he has forfeited this argument. *See Walker v. United States*, 134 F.4th 437, 440 (6th Cir. 2025).

While Blake did move to suppress the Instagram messages before trial, his challenge still comes up short. The government recovered the November 14–15 group chat from non-defendant

Ramone Turner's account because the chat had been deleted from Blake's and co-defendants' accounts. Thus, the district court held that Blake lacked standing to challenge the admission of the November 14–15 group chat. As the district court reasoned, Blake did not have a reasonable expectation of privacy in "group chat conversations [he] may have personally engaged in but that were acquired from a search of another individual's account," and therefore could not challenge the admission of the group chat on Fourth Amendment grounds. Order on Mots. to Supp., R. 249, PageID 1759.

Critically, Blake does not challenge this basis for the district court's denial of his motion to suppress. As we have explained, a party's failure to address every independent ground of a district court decision renders the judgment unreviewable because the party abandoned its challenge to rulings that independently sustain the judgment's validity. *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 456 (6th Cir. 2021). Following that principle, we have held that a defendant who did not challenge every independent ground for a denial of a motion to suppress could not prevail on appeal. *United States v. Perry*, No. 22-2031, 2024 WL 692890, at *8 (6th Cir. Feb. 20, 2024); *United States v. Fox*, 363 F. App'x 375, 377 (6th Cir. 2010). Likewise, Blake cannot prevail here because he failed to challenge the district court's conclusion that he did not have standing to exclude the November 14–15 group chat on Fourth Amendment grounds.

Blake's response is that the district court did not rest its denial of the motion to suppress on standing grounds. He points to the district court's statement at the suppression hearing that the "defendants maintained a subjective expectation of privacy in the group chat messages that was objectively reasonable." Mot. to Supp. Hr'g Tr., R. 253, PageID 1852–53. But that statement did not distinguish between group chat messages obtained from a defendant's own account versus another person's account. And the district court's subsequent written order resolved any ambiguity, clearly explaining that the defendants did not have standing to challenge evidence of chats they "may have personally engaged in," but the government obtained from "another individual's account." Order on Mots. to Supp., R. 249, PageID 1759. Without challenging that basis for the district court's decision, Blake's suppression challenge fails.

## II.      Admissibility of Co-Conspirator Statements

Blake next challenges the district court's decision to admit the November 15 group chat messages as co-conspirator statements.    Under Federal Rule of Evidence 801(d)(2)(E), co-conspirator statements are not hearsay if made "during and in furtherance of the conspiracy." For this rule to apply, the government must prove, by a preponderance of the evidence, that (1) a conspiracy existed, (2) Blake was a member of the conspiracy, and (3) co-conspirator statements were made in furtherance of the conspiracy. *United States v. Wilson*, 168 F.3d 916, 920–21 (6th Cir. 1999).  Whether the government made the necessary showing to meet these three elements is a question of fact for the district court that we review for clear error, but we review the district court's "ultimate legal conclusion regarding admissibility de novo." *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009).  If we conclude that the district court erred in admitting the evidence, we ask whether the error was harmless. *United States v. Iossifov*, 45 F.4th 899, 917 (6th Cir. 2022)

Subject to the defendants' continuing objections at trial, the district court conditionally admitted the November 14–15 group chat messages under Rule 801(d)(2)(E). *See United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979).  Then, at the close of the government's case-in-chief, the district court overruled Blake's hearsay objections and admitted the messages.  The court found that the government had proven by a preponderance of the evidence that (1) a conspiracy existed to kidnap Jackson, (2) Blake was a member of the conspiracy, and (3) the co-conspirator statements were made in furtherance of the conspiracy.

Blake no longer challenges the admission of the November 14 messages, in which members discussed plans to respond to the carjacking while they actively held Jackson.  Instead, he focuses on the November 15 statements, which were exchanged after someone shared Fat Fat's video—more than twelve hours *after* Jackson was released and picked up by her mother. Given the timing, Blake argues that the November 15 statements were made after the purpose of the conspiracy was accomplished and cannot be "in furtherance" of the conspiracy to kidnap Jackson, even assuming he was a member. *See United States v. Payne*, 437 F.3d 540, 546–47 (6th Cir. 2006) (citing *United States v. Franklin*, 415 F.3d 537, 552 (6th Cir. 2005)).   The

government responds that the statements were made in furtherance of a broader conspiracy to retaliate against Bryant and the rival gang, which was ongoing after Jackson's release.

But we need not resolve this dispute because any purported error would be harmless, as the November 15 messages were admissible on other grounds. Four messages sent by Blake were admissible as party-opponent admissions under Rule 801(d)(2)(A). Gov't Exh. 76c, R. 442, PageID 5197–98 (Statements 28, 29, 34, 37). Another nine were admissible as questions and commands, categories of statements that are generally not hearsay because they are not "assertive speech" and thus not offered for their truth. *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009); Gov't Exh. 76c, R. 442, PageID 5196–200 (Statements 21, 23, 24, 27, 30, 32, 39, 41 as questions; Statement 43 as command). And seven were admissible to provide context rather than for the truth of the matter asserted. Gov't Exh. 76c, R. 442, PageID 5196–200 (Statements 20, 22, 25, 26, 38, 40, 42); *see United States v. Jaffal*, 79 F.4th 582, 598 (6th Cir. 2023). Blake asserts that all the November 15 statements were inadmissible hearsay, but he does not specifically dispute the admissibility of these twenty messages.

Instead, Blake disputes whether the four remaining messages qualify as statements against penal interest. Gov't Exh. 76c, R. 442, PageID 5197–98 (Statements 31, 33, 35, 36). The statements at issue, which were made by co-conspirators, are:

- Statement 31: "That is kipnapping";
- Statement 33: "Ima beat tht lil girl ass who recorded";
- Statement 35: "They dumb asf got me all in that camera"; and
- Statement 36: "[They] shouldn't have all those extra bodies in the house fr that shit was dumb."

Rule 804(b)(3) excepts certain statements against a person's penal interest from the definition of hearsay. For a statement to be admitted as a statement against penal interest, (1) the declarant must be unavailable; (2) "the statements must, 'from the perspective of the average, reasonable person,' be adverse to the declarant's penal interest"; and (3) "corroborating circumstances must 'truly establish the trustworthiness of the statement.'" *United States v. Johnson*, 581 F.3d 320, 326–27 (6th Cir. 2009) (quoting *United States v. Tocco*, 200 F.3d 401,

414 (6th Cir. 2000)).  Blake does not challenge unavailability, instead focusing on the other two prongs—adversity and trustworthiness.

These four statements are, from a reasonable person's perspective, against penal interest because they implicate the co-conspirators who made these statements in Jackson's kidnapping and beating.  Blake counters that the co-conspirators made these statements without understanding that they were subjecting themselves to criminal liability.  But the test is an objective one, and a reasonable person would think admitting to kidnapping or assault is against their penal interest.  *See id.* at 327.  Blake's reliance on *United States v. Alvarez* to argue the contrary is unavailing because its facts are not analogous.  266 F.3d 587 (6th Cir. 2001).  In *Alvarez*, the defendant's attorney recorded a conversation he had with a potential witness, in which the attorney enticed the witness "into making a self-inculpatory statement," in part by telling the witness that if he admitted to the illegal acts, any prosecution would be unsuccessful. *Id.* at 592.  Here, there was no reason for the members of the November 15 group chat to think that, if disclosed, their statements would not subject them to criminal liability.  In fact, they decided to end the group chat abruptly, and many participants deleted it from their accounts.

Blake next argues that the group chat context—with its "jokes and laughing emojis"— brings the trustworthiness of the statements into question.  Reply Br. at 7.  Rule 804(b)(3)'s trustworthiness analysis focuses not "on whether other evidence in the case corroborates what the statement asserts," but instead asks whether "there are corroborating circumstances which clearly indicate the trustworthiness of the statement itself," meaning corroboration that the unavailable person made the purported statement and did so without an intent to fabricate. *Johnson*, 581 F.3d at 327 (quoting *Franklin*, 415 F.3d at 547); *see also* Fed. R. Evid. 804(b)(3) Advisory Committee Note (explaining corroboration requirement's "purpose of circumventing fabrication").  Here, the government obtained the messages directly from Instagram; they are an exact record of a group chat among friends, not a hazy recollection of the chat from an outsider. *See Johnson*, 581 F.3d at 327 (finding statement trustworthy because conversation between friends was secretly recorded).  Thus, there is no question as to the messages' occurrence or accuracy, making them "trustworthy" for the purpose of this hearsay exception.

Therefore, even assuming the November 15 group chat messages could not be admitted as made "in furtherance of the conspiracy," any error would be harmless because the messages were otherwise admissible.

## III.    Limitation on Cross-Examination of Victim

Blake next argues that the district court violated the Confrontation Clause by limiting his cross-examination of Jackson regarding state charges pending against her.

Before trial, the government sought to limit the cross-examination of Jackson about post-kidnapping events.  While the kidnapping prosecution was pending, federal agents had relocated Jackson to Florida and provided her with about $37,300 for living expenses.  Under the government's relocation agreement, Jackson agreed to avoid committing any criminal offenses.  But Jackson was charged in state court with misdemeanor theft and felony fraudulent use of a credit card.  The government moved to preclude cross-examination on these charges, and Blake moved to cross-examine Jackson on the charges and their impact on her relocation agreement.  Jackson, through appointed counsel, explained that she would exercise her Fifth Amendment privilege if cross-examined about the charges.

The district court limited, but did not prevent, cross examination about Jackson's charges.  The court allowed cross-examination as to the existence of the charges, because they were relevant to Jackson's credibility, and it agreed to require Jackson to invoke her Fifth Amendment rights in front of the jury.  *See* Fed. R. Evid. 608.  But it prohibited additional questions about the details of the charges or their impact on Jackson's relocation agreement.  So at trial, counsel asked Jackson only "While in Florida, you were charged with stealing a credit card and using it, right?" and "Suffice to say, you're not in Florida anymore, right?" to which she invoked her Fifth Amendment privilege.  Trial Tr., R. 328, PageID 3186.

Blake contends that the district court's limitation violated his rights under the Confrontation Clause.  The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against [them]."  U.S. Const. amend. VI. A trial court violates the Confrontation Clause when it prohibits a defendant from "engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the

part of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).  Prototypical forms of bias include: (1) "the witness's criminal history or status as a parolee or probationer"; (2) "any immunity or plea deals" involving the witness; (3) the witness's "inconsistent statements"; and (4) "other 'prejudices, or ulterior motives,'" that can undermine the witness's reliability. *Blackston v. Rapelje*, 780 F.3d 340, 349 (6th Cir. 2015) (citation omitted).

We review alleged violations of the Confrontation Clause de novo.  *United States v. Roberts*, 84 F.4th 659, 666–67 (6th Cir. 2023).  We use a three-step process to guide our analysis. *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000).  At the first step, we must decide whether the district court limited Blake's ability to cross-examine Jackson about her "bias, prejudice or motive to testify." *Id.*  If so, we move to the second step and consider whether, despite the limits placed on the cross-examination, the jury had sufficient information to assess Blake's "theory of bias or improper motive." *Id.*  If the jury did not have enough information to assess the theory, we turn to the third step: a balancing test that weighs the government's interests against Blake's right to confront adverse witnesses. *Id.*  If a constitutional violation occurred, we then analyze whether the error was harmless. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010).

Blake's Confrontation Clause challenge falters at the first step. The district court correctly found that the evidence at issue here was relevant to Jackson's credibility rather than her bias, prejudice, or motive to testify.  Blake sought to cross-examine Jackson on how her pending state charges for misdemeanor theft of a credit card and felony fraudulent use of a credit card interacted with her promise under the relocation agreement to not commit any crimes.  But, as the government explained, Jackson was not an informant and had not entered any agreement regarding the charges, such as an agreement for leniency in exchange for her testimony.  The government further disclosed that it did not learn of Jackson's charges until it was preparing for trial, and it did not help Jackson leave Florida to avoid arrest.  Given this context, the district court properly concluded that the evidence did not go to bias, prejudice, or motive but instead to Jackson's general credibility.  And "cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not." *Boggs*, 226 F.3d at 737 (citing *Olden v. Kentucky*, 488 U.S. 227, 232 (1988)).  Therefore, the court did not

err by allowing limited cross-examination about the existence of the charges but prohibiting additional questions about their details or impact on Jackson's relocation agreement. The court also permitted cross-examination about payment and other aspects of the relocation agreement, which were relevant to Jackson's bias or motive to testify.

To challenge the district court's limitation, Blake relies entirely on our recent decision in *United States v. Taylor*, 127 F.4th 1008 (6th Cir. 2025). But that case, which held that the district court's limits on cross examination violated the Confrontation Clause, is distinguishable from the circumstances here. In *Taylor*, we held that a defendant's desired cross-examination of a key government witness on his felon-in-possession charge went to the witness's bias and motivation for testifying. *Id.* at 1015. The court noted that the witness had requested benefits for cooperating in the defendant's prosecution and that the state prosecutor intended to dismiss the felon-in-possession charge and considered dropping a revocation case against the witness for his testimony against the defendant. *Id.* Therefore, whether the witness's preferential treatment influenced his testimony was "core impeachment evidence" that went to bias and motivation to testify. *Id.* (quoting *United States v. Ralston*, 110 F.4th 909, 918 (6th Cir. 2024)). Here, by contrast, the government informed the district court that Jackson had not received any preferential treatment in her Florida case and had no agreement with the government about her pending charges. This case, therefore, is akin to situations where our court has affirmed limitations on cross-examination because there was no link between the government's actions and the witness's testimony. *See, e.g.*, *United States v. Davis*, 430 F.3d 345, 360–61 (6th Cir. 2005) (government's failure to turn over witness to local authorities not linked to witness's testimony). Accordingly, we affirm the district court's limitation on cross-examination.

## IV.    Sufficiency of Evidence

Blake next argues that the district court erred in denying his Rule 29 motion for judgment of acquittal because the evidence was insufficient to support his conviction for aiding and abetting kidnapping. We review a challenge to the sufficiency of the evidence supporting a conviction de novo. *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014). The test for sufficiency of the evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Id.* at 430–31 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The kidnapping statute requires four elements for a completed offense: (1) "the defendant unlawfully seized, confined, inveigled, decoyed, abducted, or carried away the victim"; (2) "the defendant held the victim"; (3) "the holding was for ransom or reward or otherwise"; and (4) "the defendant did so in a manner [that created] federal jurisdiction." *United States v. Ferguson*, 65 F.4th 806, 811 (6th Cir. 2023); *see* 18 U.S.C. § 1201(a). To prove that Blake aided and abetted kidnapping, the government needed to show that he "(1) [took] an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). Liability attaches even if Blake aided only one or some of the kidnapping's phases or elements. *United States v. Soto*, 794 F.3d 635, 661 (6th Cir. 2015).

A review of the evidence in the record reveals that, construed in favor of the verdict, Blake affirmatively acted to facilitate the kidnapping. Blake did not arrive until after other gang members brought Jackson to his house and began interrogating her, but when he arrived, he confined her in the bathroom, then in his room; ordered Greene and Kimbrough to beat her; and then ordered them to drive her to Bryant's house. Having heard these facts, a rational juror could have found Blake guilty beyond a reasonable doubt of aiding and abetting kidnapping.

Blake makes three sufficiency counterarguments, none of which are persuasive. He first argues that he never "held" Jackson, as that term is defined for kidnapping. But Blake's conviction does not rest on a finding that he himself "held" Jackson. He was convicted for aiding and abetting, not for the kidnapping itself. And Blake does not dispute that the jury could have convicted him by finding that any of his confederates kidnapped Jackson, including by holding her, and that he took affirmative acts that intentionally facilitated that crime.

Even so, the evidence is sufficient to show that Blake himself "held" Jackson. Holding requires an "unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent to confine the victim." *Chatwin v. United States*, 326 U.S. 455, 460 (1946). "Remarkably little case law elucidates the standard set down in *Chatwin*."

*Ferguson*, 65 F.4th at 811.  But in *Chatwin*, the Supreme Court reversed a kidnapping conviction on the holding element because there was "no proof that [the defendant] or any of the other petitioners willfully intended through force, fear or deception to confine the girl against her desires," no evidence that the alleged victim "was deprived of her liberty, compelled to remain where she did not wish to remain, or compelled to go where she did not wish to go," and instead evidence showed that "she was perfectly free to leave the [defendants] when and if she so desired."  326 U.S. at 460.  By contrast, here, the government presented ample evidence that Blake willfully intended through force to confine Jackson against her desires, deprived Jackson of her liberty, and both compelled her to remain where she did not wish to remain—the house— and to go where she did not wish to go—in a car to Bryant's house.  And Jackson testified, corroborated by contemporaneous texts to her mother, that she did not feel like she could leave and did not voluntarily follow Blake.  Therefore, the evidence shows that Blake "held" Jackson.

Next, Blake makes a cursory argument that he did not aid and abet the kidnapping.  But the evidence of Blake's actions discussed above is enough to establish that he aided and abetted the kidnapping.  And, to the extent that Blake argues that the evidence was insufficient because the jury acquitted him of conspiracy, he is not permitted to challenge his conviction for aiding and abetting on the basis that "it was inconsistent with the jury's verdict of acquittal on another count."  *United States v. Powell*, 469 U.S. 57, 58, 64–65 (1984).

Finally, Blake argues that there was insufficient evidence to create federal jurisdiction.  At trial, the government presented evidence that Blake and his codefendants used cellphones in furtherance of the kidnapping.  Blake acknowledges that we have held that a defendant's intrastate use of a cellphone satisfies the interstate commerce requirement for kidnapping because a cellphone is itself an instrumentality of interstate commerce.  *See, e.g.*, *United States v. Windham*, 53 F.4th 1006, 1011 (6th Cir. 2022).  Therefore, his challenge fails under our binding precedent.  That precedent has been questioned, *United States v. Allen*, 86 F.4th 295, 308 (6th Cir. 2023) (Murphy, J., concurring), but Blake raises this jurisdictional argument only to preserve it for further review.  We also note that Blake and his codefendants used social media to communicate during the kidnapping, but since the government identified that social-media use as

a basis for federal jurisdiction in a conclusory manner, we do not opine on the sufficiency of that evidence.

Since Blake's sufficiency challenge fails, we affirm the district court's denial of his Rule 29 motion for judgment of acquittal.

## V.       Special Conditions of Supervised Release

Blake further contends that his supervised release conditions should be vacated or modified because the district court erred in imposing three special conditions: (1) prohibiting Blake from being "found in the social company of any person who you know or reasonably ought to know is a member of or associated with [] a gang"; (2) prohibiting Blake from "possess[ing], wear[ing] or display[ing] any article of clothing to which any insignia or name (including, for example, either a designer's name or symbol), which is easily discernible from a distance or more than 10 feet"; and (3) prohibiting him from acquiring "tattoos, body markings or piercings of any kind."   Judgment, R. 393, PageID 4496.   All three conditions were recommended in Blake's presentence report, and Blake's counsel did not object to them.   The district court orally pronounced the first condition at sentencing, but it imposed the other two only in the written judgment. *Compare* Sent'g Hr'g Tr., R. 406, PageID 4724, *with* Judgment, R. 393, PageID 4496.

As a threshold matter, we reject the government's contention that Blake's challenge is not ripe.   Generally, "conditions of supervised release may be ripe for appellate review immediately following their imposition at sentence." *United States v. Lee*, 502 F.3d 447, 449–50 (6th Cir. 2007).   We have found a challenge to be unripe when the challenged conditions were "potential, rather than mandatory." *See United States v. Zobel*, 696 F.3d 558, 573 (6th Cir. 2012).   But the conditions Blake challenges are all mandatory which makes his challenge ripe for review. *See id.*

We turn to the first challenged condition—prohibiting Blake from being "found in the social company of any person who you know or reasonably ought to know is a member of or associated with [] a gang."   Since the district court orally pronounced this condition at sentencing without objection from Blake, the parties agree that we review for plain error. *Zobel*, 696 F.3d at

573. Our sister circuits are split on whether such a prohibition on associating with gang "associates" is impermissibly vague or overbroad. *Compare United States v. Johnson*, 626 F.3d 1085, 1090–91 (9th Cir. 2010) (vacating condition prohibiting association with "anyone known to him to be a Rollin' 30's gang member or persons associated with the Rollin' 30's gang"), *with United States v. Marshall*, 808 F. App'x 11, 12–13 (2d Cir. 2020) (order) (upholding condition prohibiting association "with any member, associate or prospect of any criminal gang, club or organization"), *and United States v. Romig*, 933 F.3d 1004, 1005–07 (8th Cir. 2019) (upholding condition prohibiting defendant from "associat[ing] with any member, prospect, or associate of the Hell's Angels motorcycle gang, or any other gang"). A circuit split precludes our finding plain error, so we affirm the imposition of this condition at this stage. *Zobel*, 696 F.3d at 574–75. We do not resolve Blake's challenge on the merits, however, and do not opine on its validity under a different standard of review.

The parties next dispute the appropriate standard of review for the other two conditions disclosed in the presentence report but not orally pronounced. Blake argues for de novo review based on the discrepancy between the oral and written sentences. *See United States v. Booker*, 994 F.3d 591, 600 (6th Cir. 2021). The government, on the other hand, argues for plain error review, because Blake did not object to that portion of the presentence report despite having the opportunity to do so. *See United States v. Doyle*, 711 F.3d 729, 732 (6th Cir. 2013); *see also United States v. Bryant*, No. 24-3360, 2025 WL 1178394, at *2–3 (6th Cir. Apr. 23, 2025).

We agree with Blake that de novo review applies. Blake has a Fifth Amendment Due Process right to be present at sentencing, *United States v. Hayden*, 102 F.4th 368, 371 (6th Cir. 2024), and the oral pronouncement (rather than the written judgment) constitutes his sentence, *United States v. Shaw*, 139 F.4th 548, 553 (6th Cir. 2025). During that oral pronouncement, the district court did not incorporate the special conditions in the presentence report by reference, as it did for the standard conditions. *See Hayden*, 102 F.4th at 372. Nor did it otherwise orally announce these two special conditions. We do not require criminal defendants to flag potential harsher supervised release conditions that the district court did not impose at the sentencing hearing just to preserve their appellate rights should the court later add them in a written judgment. And given that Blake had no opportunity to object to the conditions imposed in the

written judgment alone, we do not apply plain error review. *See* Fed. R. Crim. P. 51(b).  Instead, we review the discrepancy between the oral pronouncement and written judgment de novo because Blake alleges constitutional error. *United States v. Carpenter*, 702 F.3d 882, 884 (6th Cir. 2012).

As to these conditions, the district court's written judgment imposes greater restrictions than those announced at sentencing.  At sentencing, the district court told Blake that he could "not possess, wear or display in any manner, any insignia, clothing, articles of clothing, designed, arranged or used in any way to symbolize membership in, affiliation with or approval of a gang."  Sent'g Hr'g Tr., R. 406, Page ID 4724.  But the written judgment included another sentence which drastically expanded the scope of the restriction by telling Blake that he could "not possess, wear or display any article of clothing to which any insignia or name (including, for example, either a designer's name or symbol), which is easily discernible from a distance or more than 10 feet."  Judgment, R. 393, PageID 4496.  Similarly, the district court imposed a third condition prohibiting Blake from acquiring "tattoos, body markings or piercings of any kind" without announcing it at sentencing.  *Id.*  That discrepancy violates Blake's right to be present at sentencing.  *See Hayden*, 102 F.4th at 371.  On appeal, Blake also raises serious questions about the constitutionality of these conditions.  He contends that the conditions are impermissibly vague and overbroad, in violation of his First Amendment rights.  By our read, these conditions would prohibit Blake from wearing a Detroit Lions jersey or obtaining an ear piercing, even if neither item had any gang significance.

Given Blake's constitutional right to right to be present at sentencing, we remand to the district court to resolve the discrepancy between the orally pronounced sentence and the written judgment and, if necessary, to address Blake's constitutional challenges to the latter two conditions with the benefit of argument from the parties.

## CONCLUSION

We affirm Blake's conviction and remand Blake's sentence to the district court for further actions consistent with this opinion as to the second and third challenged special conditions of supervised release.